Maloney v. Alliance Dev. Group, L.L.C., 2006 NCBC 11

| | |
|---|---|
| NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| COUNTY OF MECKLENBURG | 06 CVS 6776 |

ROBERT  BRIAN MALONEY

           Plaintiff,

    v.

ALLIANCE DEVELOPMENT GROUP, LLC,
ALLIANCE D. HOLDINGS, LLC, and
WILLIAM BURK, individually,

           Defendants.

**ORDER**

*Rayburn, Cooper & Durham, P.A. by C. Richard Rayburn, Jr., G. Kirkland Hardymon, and Tasha Winebarger for Plaintiff Robert Brian Maloney.*

*DeVore, Acton & Stafford, P.A. by Fred W. DeVore, III, for Defendants Alliance Development Group, LLC, Alliance D. Holdings, LLC, and William Burk.*

Diaz, Judge.

{1}     The Court heard this matter on 4 August 2006 on the Motion of Plaintiff Robert Brian Maloney ("Maloney") for Issuance of a Preliminary Injunction and Appointment of a Receiver.  For the reasons set forth below, and after considering the Court file, the written Motion, and counsels' memoranda and oral arguments, the Court **DENIES** the Motion on the grounds that Maloney has failed to show a likelihood of success on the merits of his Uniform Fraudulent Transfer Act ("UFTA") claim.

**I.**

**PROCEDURAL BACKGROUND**

{2}     Plaintiffs Maloney and Trinity Road Restaurants, LLC ("Trinity") filed a Verified Complaint on 5 April 2006 in Mecklenburg County Superior Court.  The case was transferred to the North Carolina Business Court and assigned to me as a mandatory complex business case by order of the Chief Justice of the North Carolina Supreme Court dated 8 May 2006.

{3}     On 25 May 2006, Plaintiffs filed a Motion for Issuance of a Preliminary Injunction and Appointment of a Receiver.

{4}     Defendants Alliance Development Group, LLC ("Alliance Development") and William Burk ("Burk") filed an Answer, Motion to Dismiss, and a Motion to Strike on 6 June 2006.

Alliance Development and Burk also filed a Memorandum Opposing Issuance of a Preliminary Injunction and Appointment of a Receiver on 7 June 2006.

{5}     On 8 June 2006, Plaintiffs filed a Motion to Amend the complaint to add Alliance D. Holdings, LLC ("Alliance Holdings") as a party defendant. Plaintiffs' Motion to Amend was granted by order of this Court dated 9 June 2006.

{6}     On 13 June 2006, Trinity filed a Voluntary Dismissal without Prejudice as to its claims.

{7}     Maloney filed his Second Verified Amended Complaint on 14 June 2006.

{8}     On 28 July 2006, Maloney filed a Supplemental Memorandum in Support of Plaintiff's Motion for Issuance of a Preliminary Injunction and Appointment of a Receiver. Defendants Alliance Development, Alliance Holdings, and Burk filed their Response on 1 August 2006. Maloney filed an Addendum to Supplemental Memorandum in Support of Plaintiff's Motion for Issuance of a Preliminary Injunction and Appointment of a Receiver on 2 August 2006.

{9}     On 4 August 2006, this Court heard oral arguments on the Motion for Issuance of a Preliminary Injunction and Appointment of a Receiver.

{10}    Defendants Alliance Development, Alliance Holdings, and Burk filed an Answer to Maloney's Second Verified Amended Complaint on 15 August 2006.

## II.

## FACTUAL BACKGROUND

### A.

### THE PARTIES

{11}    Plaintiff Maloney is a citizen and resident of the state of Pennsylvania. (Second Verified Am. Compl. ¶ 1.) Maloney is a franchisee of Damon's International, Inc. ("Damon's"). (Second Verified Am. Compl. ¶ 20.)

{12}    Defendant Alliance Development is a limited liability company organized under the laws of the state of Delaware with its principal place of business in Mecklenburg County, North Carolina. (Second Verified Am. Compl. ¶ 2.)

{13}    Defendant Alliance Holdings is a limited liability company organized under the laws of the state of Delaware with its principal place of business in Mecklenburg County, North Carolina. (Second Verified Am. Compl. ¶ 3.)

{14}    Defendant Burk is a citizen and resident of the state of North Carolina. (Second Verified Am.

Compl. ¶ 5; Burk Aff. ¶ 1.) Burk is the president of Alliance Development, managing member of Alliance Holdings, and chairman of the board and chief operating officer of Damon's. (Burk Aff. ¶¶ 2-5.)

## B.

## OVERVIEW OF THE FACTS

{15} Maloney's Motion for Issuance of a Preliminary Injunction and Appointment of a Receiver arises out of alleged violations of the UFTA. (Pl.'s Mot. for Appointment of a Receiver and Issuance of a Prelim. Inj. ¶¶ 1-9.) The UFTA, N.C.G.S. §§ 39-23.1 to -23.12 (2006), prohibits a debtor from transferring its assets if the transfer is made with the intent to hinder, delay, or defraud a creditor. N.C.G.S. § 38-23.4(a)(1). The UFTA also prohibits a debtor from transferring its assets if the debtor does not receive "reasonably equivalent value" in exchange for the transfer and the transfer either rendered the debtor insolvent or was made at a time when the debtor was already insolvent. N.C.G.S. §§ 39-23.4(b), 39-23.5.

{16} In August 2003, Maloney and Damon's became involved in litigation in which Maloney alleged territorial violations in response to Damon's allegations that Maloney was in default of his franchisee obligations. (Second Verified Am. Compl. ¶ 35; Defs.' Answer to Second Verified Am. Compl. ¶ 35.)

{17} Maloney alleges that, on 4 August 2005, he and third-parties John M. Self ("Self") and Larry C. Fox ("Fox") entered into an agreement with Alliance Development to form a Delaware limited liability company, Alliance Damon's Acquisition, LLC ("Alliance Acquisition"), for the purpose of acquiring the stock and business operations of Damon's ("the 4 August 2005 Agreement"). (Second Verified Am. Compl. ¶¶ 29-31; Second Verified Am. Compl. Ex. F.)

{18} After Alliance Acquisition closed on the purchase of Damon's, Maloney, under the 4 August 2005 Agreement, was to receive reimbursement of legal fees incurred in his action against Damon's, a litigation settlement fee of $1,000,000, and financing from the sale and leaseback of three Damon's restaurants. (Second Verified Am. Compl. Ex. F ¶ 4; Second Verified Am. Compl. ¶ 36; Defs.' Answer to Second Verified Am. Compl. ¶ 36.)

{19} Paragraph 9 of the 4 August 2005 Agreement provides that "if a fully executed Stock Purchase Agreement with all the shareholders of Damon's is not executed within 30 days of [4 August 2005], this Agreement shall be null and void." (Second Verified Am. Compl. Ex. F ¶ 9.) Paragraph 9 of the 4 August 2005 Agreement also provides that "each party to this Agreement agrees that he or it will not enter into any type of transaction with Damon's unless such a party first obtains the written consent signed by all the parties hereto." (Second Verified Am. Compl. Ex. F ¶ 9.)

{20}    Maloney alleges that he had an original financing plan to rehabilitate Damon's and that this plan, coupled with his business expertise, constituted his contribution to Alliance Acquisition.  (*See* Second Verified Am. Compl. ¶¶ 33, 42, 48-49.)

{21}    Alliance Acquisition was organized as a Delaware limited liability company on 8 August 2005. (Second Verified Am Compl. ¶ 32; Defs.' Answer to Second Verified Am. Compl. ¶ 32.)

{22}    On 13 September 2005 (more than 30 days after the execution of 4 August 2005 Agreement), Alliance Acquisition entered into a stock purchase agreement with the shareholders of Damon's ("the 13 September 2005 Stock Purchase Agreement").  (Second Verified Am. Compl. Ex. G.)  Originally, closing was to occur eighty days after the effective date of the Stock Purchase Agreement.  (Second Verified Am. Compl. Ex. G § 2.3.)  Later, the deadline for closing was extended to 15 February 2006.  (Burk Aff. ¶ 17; Burk Aff. Ex. D.)

{23}    Maloney alleges that he negotiated a debt reduction of approximately $3,000,000 with Damon's creditors in November 2005.  (Second Verified Am. Compl. ¶ 41.)

{24}    Defendants allege that Maloney attempted to purchase the stock of Damon's surreptitiously and in violation of the alleged 4 August 2005 Agreement in early February 2006.  (Defs.' Answer to Second Verified Am. Compl. Countercl. ¶¶ 9-16, 21-24; Burk Aff. ¶¶ 18-22; *see* Burk Aff. Ex. E; *see also* Burk Aff. Ex F.)

{25}    Maloney alleges that, on 10 February 2006, the shareholders of Damon's consented to an assignment of all rights under the 13 September 2005 Stock Purchase Agreement from Alliance Acquisition to Alliance Development.  (Addendum to Supplemental Mem. in Supp. of Pl.'s Mot. for Issuance of a Prelim. Inj. and Appointment of a Receiver Ex. 3.)

{26}    Alliance Acquisition did not acquire Damon's.  (*See* Second Verified Am. Compl. ¶ 45; *see also* Defs.' Answer to Second Verified Am. Compl. ¶ 36.)

{27}    In March 2006, the stockholders of Damon's and Alliance Holdings entered into a new stock purchase agreement.  (Burk Aff. ¶ 24.)  This transaction closed on 7 April 2006.  (Burk Aff. ¶ 26; Second Verified Am. Compl. ¶ 48; Defs.' Answer to Second Verified Am. Compl. ¶ 48.)

{28}    Maloney alleges that Alliance Development transferred all of Alliance Acquisition's assets to itself in violation of the UFTA.  (Second Verified Am. Compl. ¶ 49.)  These assets include: (1) Alliance Acquisition's rights under the 13 September 2005 Stock Purchase Agreement; (2) Maloney's financing plan for rehabilitating Damon's; and (3) any discount in debt that Maloney negotiated on behalf of Damon's.  (Second Verified Am. Compl. ¶ 49.)

{29}    Maloney is seeking the appointment of a receiver under N.C.G.S. § 1-502 (2006) and N.C.G.S. §

39-23.7(a)(3)(b) to "take all actions necessary to preserve [Damon's] assets and to carry on the business of [Damon's] in a manner consistent in [sic] the best interests of the creditors, stockholders, and franchisees of [Damon's]." (Pl.'s Mot. for Appointment of a Receiver and Issuance of a Prelim. Inj. Prayer for Relief ¶ B.)

{30}    Maloney is also seeking the issuance of a preliminary injunction under N.C.G.S. § 1-285 (2006) and N.C.G.S. § 39-23.7(a)(3)(a) restraining the Defendants from both "transferring, liening, or in any way diminishing the value of the property transferred from [Alliance Acquisition]," (Pl.'s Mot. for Appointment of a Receiver and Issuance of a Prelim. Inj. Prayer for Relief ¶ C.), and "undertaking actions outside the ordinary course of business or permitting or causing [Damon's] to take such actions" (Pl.'s Mot. for Appointment of a Receiver and Issuance of a Prelim. Inj. Prayer for Relief ¶ D).

## III.

## CONCLUSIONS OF LAW

### A.

### THE UFTA

{31}    The UFTA is enacted in North Carolina at N.C.G.S. §§ 39-23.1 to -23.12.  Under the UFTA:

> A transfer [of property] or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation:
>
> (1) With intent to hinder delay, or defraud any creditor of the debtor; or
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation; and the debtor:
> a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> b. Intended to incur, or believed the debtor would incur debts beyond the debtor's ability to pay as they became due.

N.C.G.S. § 39-23.4(a).

{32}    Further, the UFTA provides that:

> A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or obligation incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

N.C.G.S. § 39-23.5(a).

{33}    In an action for relief under the UFTA:

> [A] creditor . . . may obtain . . . [s]ubject to the applicable principles of equity and in accordance with the applicable rules of civil procedure . . . [a]n injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or other property; [or] . . . [a]ppointment of a receiver to take charge of the asset transferred or of other property of the transferee.

N.C.G.S. § 39-23.7(a).

## B.

## EQUITABLE RELIEF UNDER THE UFTA

{34}   Equitable relief under the UFTA is issued "subject to the applicable principles of equity and in accordance with the applicable rules of civil procedure." N.C.G.S. § 39-23.7(a). North Carolina courts appoint receivers pursuant to N.C.G.S § 1-502, and they issue preliminary injunctions pursuant to N.C.G.S. § 1-485.

{35}   Under N.C.G.S. § 1-502, a court may appoint a receiver before judgment "when [a party] establishes an apparent right to property which is the subject of the action and in the possession of an adverse party, and the property or its rents and profits are in danger of being lost, or materially injured or impaired." N.C.G.S. § 1-502.

{36}   Under N.C.G.S. § 1-485, a court may issue a preliminary injunction in three situations: (1) when it appears the plaintiff is entitled to the relief demanded, and the relief consists of restraining the commission or continuance of some act which would produce injury to the plaintiff; (2) when it appears that a party to litigation is doing, threatening, or about to do some act in violation of the rights of another party to the litigation and tending to render any judgment entered in the litigation ineffectual; and (3) when it appears the defendant threatens or is about to remove or dispose of his property with the intent to defraud the plaintiff. N.C.G.S. § 1-485.

{37}   North Carolina courts have long-recognized both the appointment of a receiver and the issuance of a preliminary injunction as extraordinary remedies. *E.g., Neighbors v. Evans*, 210 N.C. 550, 554, 187 S.E.796, 798 (1936) ("The courts look with jealousy on the application for the appointment of a receiver. It is ordinarily a harsh remedy."); *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 401, 302 S.E.2d 754, 759 (1983) ("A preliminary injunction is an extraordinary measure taken by a court to preserve the status quo of the parties during litigation.").

{38}   Accordingly, North Carolina courts will neither appoint a receiver nor issue a preliminary injunction unless the movant can show a likelihood of success on the merits of his claims. N.C.G.S. § 1-502 ("A receiver may be appointed . . . [b]efore judgment, on the application of either party, *when he establishes an apparent right to property* which is the subject of the action.") (emphasis added);

*Neighbors,* 210 N.C. at 554, 187 S.E. at 798 ("*The right to relief must be clearly shown* and also the fact that there is no other safe and expedient remedy.") (emphasis added); *Witz, Biedler & Co. v. Gray*, 116 N.C. 48, 55, 20 S.E. 1019, 1020 (1895) ("[P]laintiffs are not entitled to have [the] ancillary relief [of a receiver] unless they are entitled to the main relief demanded in their complaint."); *e.g., A.E.P.*, 308 N.C. at 401, 302 S.E.2d at 759 ("[A preliminary injunction] will be issued only . . . if a plaintiff is able to show *likelihood of success on the merits of his case.*") (emphasis added).

## C.

## LIKELIHOOD OF SUCCESS ON THE MERITS

{39}   Maloney has failed to show a likelihood of success on the merits of his UFTA claim because he has not shown (1) that he is, or has ever been, a creditor of Alliance Acquisition; and (2) the existence of a fraudulent transfer.

## 1.

## CREDITOR STATUS

{40}   Relief under the UFTA is predicated on the plaintiff's status as a creditor of the defendant.  *See* N.C.G.S. § 39-23.4(a) ("A transfer . . . by a debtor is fraudulent *as to a creditor* . . . if the debtor made the transfer . . . [w]ith intent to hinder delay, or defraud any *creditor* . . . or . . . [w]ithout receiving a reasonably equivalent value in exchange.") (emphasis added); *see also* N.C.G.S. § 39-23.5(a) ("A transfer made . . . is fraudulent *as to a creditor* whose claim arose before the transfer was made or obligation incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation.") (emphasis added); *see also* N.C.G.S. § 39-23.7(a) ("[A] *creditor* . . . may obtain . . . [a]n injunction against further disposition by the debtor . . . of the asset transferred or other property; [or] . . . [a]ppointment of a receiver to take charge of the asset transferred or of other property.") (emphasis added).

{41}   The UFTA defines a creditor as any person who has a "right to payment."  N.C.G.S. §§ 39-23.1(3) to 39-23.1(4).

{42}   Maloney argues that he has a "right to payment" from Alliance Acquisition on three different grounds.  First, Maloney argues that he has a right to payment from Alliance Acquisition based on paragraph 4 of the 4 August 2005 Agreement.  (Second Verified Am. Compl. ¶¶ 36-38, 50; Mem. in Supp. of Pl.'s Mot. for Issuance of a Prelim. Inj. and Appointment of a Receiver 4:10-14.)  Second, Maloney argues that he has a right to payment from Alliance Acquisition based on the investment of his business expertise and original financing and rehabilitation plan.  (*See* Second Verified Am. Compl. ¶¶ 33, 42, 48-

49.)  Third, Maloney argues that he has a right to payment from Alliance Acquisition based on his renegotiation of Damon's debt.  (*See* Second Verified Am. Compl. ¶ 41, 48-49.)

{43}  Maloney first argues that he has a right to payment from Alliance Acquisition based on paragraph 4 of the 4 August 2005 Agreement.  (Second Verified Am. Compl. ¶¶ 36-38, 50; Mem. in Supp. of Pl.'s Mot. for Issuance of a Prelim. Inj. and Appointment of a Receiver 4:10-14.)  However, the 4 August 2005 Agreement terminated by its own terms on 3 September 2005, 30 days after it was executed, and, even if the contract had not terminated by its own terms, the condition triggering any right to payment Maloney might have had under paragraph 4 of the 4 August 2005 Agreement never occurred.

{44}  Paragraph 9 of the 4 August 2005 Agreement states:

> The parties will make an offer to purchase Damon's stock within 10 days of the date hereof and attempt to close the transaction within 120 days.  *If a fully executed Stock Purchase Agreement with all shareholders of Damon's is not executed within 30 days of the date hereof, this Agreement shall be null and void*; provided, however, each party to this Agreement agrees that he or it will not enter into any type of transaction with Damon's unless such party first obtains the written consent signed by all the parties hereto.

(Second Verified Am. Compl. Ex. F ¶ 9 (emphasis added).)

{45}  It is uncontested that Alliance Acquisition and Damon's shareholders did not enter into a stock purchase agreement until 13 September 2005 (Second Verified Am. Compl. Ex. G.), 10 days after the 3 September 2005 deadline established by paragraph 9 of the 4 August 2005 Agreement.  Further, there is no indication in the record that the 4 August 2005 Agreement was extended, and the available evidence tends to show that it was not.  (*See* Self Dep. 59:19-61:7.)

{46}  Since Alliance Acquisition did not enter into a stock purchase agreement before the 3 September 2005 deadline, the 4 August 2005 Agreement, and any rights Maloney had under it, became null and void.  Consequently, Maloney has no right to payment from Alliance Acquisition under the 4 August 2005 Agreement.

{47}  Further, even if the agreement had not terminated by its own terms, the condition triggering any right to payment Maloney might have had never occurred.

{48}  Paragraph 4 of the 4 August 2005 Agreement states:

> *Following the closing of the purchase of Damon's stock*, [Alliance Acquisition] will cause Maloney to receive the following:
>
> (a)  Reimbursement of legal fees in an amount agreed upon by Parties incurred by Maloney in connection with the lawsuit with Damon's;
>
> (b)  A litigation settlement fee of $1,000,000; and

        (c)      Financing from the sale and leaseback of three Damon's Restaurants . . . upon such terms to be agreed upon by the Parties.

(Second Verified Am. Compl. Ex. F ¶ 4 (emphasis added).)

{49}    It is uncontested that Alliance Acquisition never closed the purchase of Damon's stock. (Second Verified Am. Compl. ¶¶ 45, 48; Defs.' Answer to Second Verified Am. Compl. ¶ 48.) Since Alliance Acquisition never closed the purchase of Damon's stock, the condition precedent to any right to payment Maloney had under the 4 August 2005 Agreement was not satisfied. Thus, even if the contract had not terminated by its own terms on 3 September 2005, Maloney would still not have a right to payment under it.

{50}    Next, Maloney argues that he has a right to payment from Alliance Acquisition based on the investment of his business expertise and original financing and rehabilitation plan. (*See* Second Verified Am. Compl. ¶¶ 33, 42, 48-49.) There is nothing in the 4 August 2005 Agreement or anywhere else in the record, however, which explains how Maloney's alleged contribution of human capital to Alliance Acquisition transformed him into a creditor.

{51}    It is uncontested that Maloney invested no money in Alliance Acquisition. (Defs.' Answer to Second Verified Am. Compl. ¶ 34; *see* Second Verified Am. Compl. ¶ 34; *see also* Second Verified Am. Compl. Ex. F 1:12-1:14.) Yet, he apparently owned a 25% interest in the company. (Second Verified Am. Compl. Ex. F ¶ 1.) To the extent Maloney suggests that his equity interest makes him a creditor for the purposes of the UFTA, the Court concludes otherwise.

{52}    My research has not revealed any North Carolina cases deciding whether an equity interest constitutes a "claim" for the purposes of the UFTA. However, the United States Bankruptcy Code ("Bankruptcy Code") defines the terms "claim" and "creditor" in substantially the same manner as the UFTA. *See* N.C.G.S. § 39-23.1 cmt. 3 (2006). *Compare* 11 U.S.C.S. § 101(5) (2006) *with* N.C.G.S. § 39-23.1(3); *compare* 11 U.S.C.S. § 101(10) (2006) *with* N.C.G.S. § 39-23.1(4). Further, cases under the Bankruptcy Code hold that an equity interest is not a claim against a debtor for which the equity holder may seek to avoid a preferential transfer or file a proof of claim. *See In re Riverside-Linden Inv. Co.*, 925 F.2d 320, 323 (9th Cir. 1991); *In re Corporate Jet Aviation*, 27 B.R. 870, 871 (Bankr. N.D. Ga. 1983); *In re Pine Lake Village Apartment Co.*, 21 B.R. 478, 480 (Bankr. S.D.N.Y. 1982).

{53}    I find the reasoning of these cases persuasive. Equity investments neither trigger a right to payment nor transform capitalists into creditors. Consequently, Maloney's alleged equity interest in Alliance Acquisition does not constitute a claim for the purposes of the UFTA, and Maloney cannot claim creditor status on its account.

{54}    Finally, Maloney argues that he has a right to payment from Alliance Acquisition based on his renegotiation of Damon's debt with its primary creditor, General Electric ("GE"). (*See* Second Verified Am. Compl. ¶¶ 41, 48-49.) Again, Maloney fails to explain how these efforts make him a creditor of Alliance Acquisition.

{55}    In any event, the evidence that Maloney actually renegotiated Damon's debt is underwhelming. In support of his allegations, Maloney attaches a string of emails which show nothing more than his efforts at renegotiating Damon's debt with GE; he puts forward no evidence of a commitment. (*See* Maloney Aff. Ex. A-I, July 27, 2006.) Further, the Defendants effectively rebut Maloney's allegations with a letter from GE's counsel, dated 6 July 2006, which states that there is no agreement for the sale of various notes between GE and Damon's. (Defs.' Supplemental Mem. in Opp'n to Pl.'s Mot. for Prelim. Inj. and Appointment of Receiver Ex. D.)

{56}    Since Maloney has not shown that he has a right to payment based on the 4 August 2005 Agreement, the investment of his human capital, or the renegotiation of Damon's debt, Maloney has not shown that he is a creditor of Alliance Acquisition. Without a showing of creditor status, Maloney cannot show a likelihood of success on the merits of his UFTA claim, the prerequisite to equitable relief under N.C.G.S. § 39-23.7(a). Accordingly, Maloney is entitled to neither the issuance of a preliminary injunction nor the appointment of a receiver.

## 2.

## EXISTENCE OF A FRAUDULENT TRANSFER

{57}    Even if Maloney could show that he is a creditor of Alliance Acquisition, he would still fail to show a likelihood of success on the merits of his UFTA claim because he has not shown the existence of a fraudulent transfer.

{58}    Under the UFTA, a transfer is fraudulent if it is made with the intent to hinder, delay, or defraud a creditor. N.C.G.S. § 38-23.4(a)(1). Likewise, a transfer is fraudulent if it is made without receiving "reasonably equivalent value" in exchange for the transfer and the debtor is either insolvent at the time of the transfer or rendered insolvent by the transfer. N.C.G.S. §§ 39-23.4(b), 39-23.5.

{59}    Maloney alleges that Alliance Acquisition transferred (1) its rights under the 13 September 2005 Stock Purchase Agreement; (2) Maloney's original financing and rehabilitation plan; and (3) any discount in debt that Maloney negotiated on behalf of Damon's to Alliance Development. (Second Verified Am. Compl. ¶ 49.)

{60}    The evidence in this case tends to show that Burk, through Alliance Development, may have

breached his duty as a member of Alliance Acquisition to obtain financing for the closing of the 13 September 2005 Stock Purchase Agreement. It also tends to show that Burk may have convinced Self, a Damon's shareholder, to breach the 13 September 2005 Stock Purchase Agreement by selling his Damon's stock to Alliance Development. (*See* Addendum to Supplemental Mem. in Supp. of Pl.'s Mot. for Issuance of a Prelim. Inj. and Appointment of a Receiver Ex. 2.) In addition, the evidence tends to show that Burk, in violation of his duties under the 4 August 2005 Agreement, may have attempted to "squeeze" Maloney out of the Stock Purchase Agreement by negotiating a consent to assignment of the 13 September 2005 Stock Purchase Agreement with the remaining Damon's shareholders on or about 10 February 2006.[1] (*See* Addendum to Supplemental Mem. in Supp. of Pl.'s Mot. for Issuance of a Prelim. Inj. and Appointment of a Receiver Ex. 3.)

{61}   What the evidence does not show, however, is a transfer of property made with the intent to hinder, delay, or defraud; an exchange without receiving reasonably equivalent value; or an insolvent debtor. Without any of these showings, the existence of a fraudulent transfer cannot be established; and, without the existence of a fraudulent transfer, there is no likelihood of success on the merits of a claim under the UFTA.

{62}   With regard to the transfer of rights under the 13 September 2005 Stock Purchase Agreement, Maloney presents evidence of Burk's attempt to negotiate a consent to assignment (*see* Addendum to Supplemental Mem. in Supp. of Pl.'s Mot. for Issuance of a Prelim. Inj. and Appointment of a Receiver Ex. 3), but he presents no substantial evidence that this assignment, as required by its terms, was ratified by Damon's shareholders or that a transfer of rights under the 13 September 2005 Stock Purchase Agreement occurred before the expiration of the extended closing date.

{63}   Just as there is no substantial evidence of a transfer of rights under the 13 September 2005 Stock Purchase Agreement, there is no substantial evidence that Alliance Acquisition transferred either Maloney's financing and rehabilitation plan or any discount in debt that Maloney negotiated on behalf of Damon's. Coupling Maloney's allegations of a transfer with evidence that Alliance Holdings closed the purchase of Damon's stock shortly after Alliance Acquisition's failure simply does not carry Maloney's burden on these issues.

{64}   Further, even if Alliance Acquisition transferred these assets, Maloney presents no evidence of their value and, therefore, does not show that the transfer of assets was made without receiving reasonably equivalent value.[2]

{65}   Finally, Maloney alleges that Alliance Acquisition is insolvent, but he presents no evidence of

Alliance Acquisition's financial state either immediately before or after the alleged transfer. It is Maloney's burden to show that Alliance Acquisition is insolvent, and without evidence of Alliance Acquisition's financial status, Maloney cannot carry this burden.

{66}   Since Maloney has not shown a transfer made with the intent to hinder, delay, or defraud; an exchange without receiving reasonably equivalent value; or an insolvent debtor, he has not shown the existence of a fraudulent transfer. Regardless of his status as a creditor of Alliance Acquisition, Maloney cannot show a likelihood of success on the merits of his UFTA claim, the prerequisite to equitable relief under N.C.G.S. § 39-23.7(a), without a showing of a fraudulent transfer. Accordingly, Maloney is entitled to neither the issuance of a preliminary injunction nor the appointment of a receiver.

## CONCLUSION

{67}   Based on the foregoing, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that Plaintiff's Motion for Issuance of a Preliminary Injunction and Appointment of a Receiver is **DENIED**.

This the 18th day of September, 2006.

---

[1] There is also evidence that Maloney was the first party that attempted to circumvent the 4 August 2005 Agreement; Maloney and Self removed Burk as the sole agent authorized to negotiate financing for the 13 September 2005 Stock Purchase Agreement and attempted to close the Stock Purchase Agreement without him. (*See* Defs.' Supplemental Mem. in Opp'n to Pl.'s Mot. for Prelim. Inj. and Appointment of Receiver Ex. B.)

[2] The evidence of record indicates that the "assets" Maloney alleges Alliance Acquisition transferred to Alliance Development were valueless. The evidence indicates that the 13 September 2005 Stock Purchase Agreement expired by it own terms, and any rights under that agreement terminated as a result. (Laws Dep. 117:24-118:4; Self Dep. 59:19-61:7.) Further, the evidence indicates that Maloney's plan for rehabilitating Damon's was not particularly original. (Self Dep. 55:12-56:25, 62:2-62:8.) Finally, the evidence that Maloney actually renegotiated Damon's debt is very weak (*see* Defs.' Supplemental Mem. in Opp'n to Pl.'s Mot. for Prelim. Inj. and Appointment of Receiver Ex. D), and even if Maloney did renegotiate Damon's debt, it is difficult to conceive of this renegotiation as the property of Alliance Acquisition, an entity both parties concede never owned a single share of Damon's stock. (*See* Second Verified Am. Compl. ¶ 45; *see also* Defs.' Answer to Second Verified Am. Compl. ¶ 36.) Since these "assets" apparently had no value, their gratuitous transfer is not "a transfer without receiving a reasonably equivalent value in exchange."